IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

AUBREY T. EISOM,

     Petitioner,

v.                                      No. 13-1289

MICHAEL DONAHUE,
Warden of HCCF,

     Respondent.

---

ORDER DENYING PETITIONER'S
MOTION FOR SUMMARY JUDGMENT

---

On October 21, 2013, Petitioner, Aubrey T. Eisom, Tennessee Department of Correction prisoner number 281380, an inmate at Hardeman County Correctional Facility ("HCCF") in Whiteville, Tennessee, filed a *pro se* petition pursuant to 28 U.S.C § 2254 (Docket Entry ("D.E.") 1) and paid the filing fee. (D.E. 3.) On January 2, 2014, the Court directed Petitioner to submit an amended petition (D.E. 4), which he did on March 19, 2014. (D.E. 8.) The Court issued an order on May 8, 2014, directing Respondent, Michael Donahue, Warden of HCCF, to file a response to the amended petition (D.E. 9), which he submitted on August 28, 2014 along with the state court record. (D.E. 19.) On March 2, 2015, Eisom moved for summary judgment. (D.E. 24.) For the following reasons, Petitioner's motion is DENIED.

I.       STATE COURT PROCEDURAL HISTORY

A Dyer County (Tennessee) Circuit Court jury convicted Petitioner of two counts of first degree felony murder and one count of especially aggravated robbery. *State v. Eisom*, No. W2009-02098-CCA-R3-CD, 2010 WL 4540069, at *1 (Tenn. Crim. App. Nov. 5, 2010), *perm.*

1

*app. denied* (Tenn. March 9, 2011). The trial court sentenced Eisom to consecutive sentences of life imprisonment for both of the felony murder convictions and a consecutive sentence of forty years' incarceration for the especially aggravated robbery conviction. *Id.* The Tennessee Court of Criminal Appeals ("TCCA") affirmed the convictions and sentences on November 5, 2010. *Id.* at *19. The Tennessee Supreme Court denied discretionary review on March 9, 2011. *Id.* at *1. Petitioner filed for state post-conviction relief on February 10, 2012. (D.E. 20-15.) The petition was denied, and the TCCA affirmed on September 24, 2013. *Eisom v. State*, No. W2012-02355-CCA-R3-PC, 2013 WL 5423073, at *19 (Tenn. Crim. App. Sept. 24, 2013). He did not seek review by the Tennessee Supreme Court. *Id.* at *1.

The facts underlying Petitioner's conviction are set forth in the opinion of the TCCA on direct appeal:

> The convictions in this case relate to the execution-style murders of Jeffery "Snap" McMullin and Cristin Robinson during the course of the especially aggravated robbery of Mr. McMullin at Mr. McMullin's residence in Dyer County.

> Shortly after 11:00 p.m. on August 13, 2007, Barbara Ford was at her home when she heard someone banging on her door and a little boy's voice yelling. Thinking that the boy said, "[M]y cat is dead," Ms. Ford answered the door to find five-year-old Xavier Johnson, who was clad in only blue jeans and socks, covered in blood and "hysterical." Xavier said, "Take me home to my mama; my daddy is dead; he already dead." When Ms. Ford tried to assure him that his father was not dead, Xavier said, "Some gangsters killed my daddy." She asked if he had seen the perpetrators, and he said, "Yeah." She then asked what they had said, and Xavier replied, "Where the money at?" At that point, Ms. Ford went to a neighbor's apartment to call police. She said that Xavier's father lived "[a]bout half a block" from her apartment. She stayed with Xavier and rode with him to the police department.

> Ms. Ford clarified that Xavier said "[g]angsters" had killed his father and not "gangster" had killed his father. Ms. Ford also said that she had known Mr. Eisom for 16 years and that, in her opinion, he was "a nice young man."

> ….

> Lieutenant Billy Williams interviewed Xavier, who was present with his mother and uncle, and Xavier told him, "Gangsta killed my daddy." Xavier elaborated that "Gangsta"

and another individual killed his father and "a white girl," who he called "Kris." Xavier told Lieutenant Williams that the assailants first shot Ms. Robinson in the mouth and then shot Mr. McMullin in the ear. Xavier said that his "Uncle Gangsta" "had a small gun and the other boy had a[n] oozie," which Xavier described as a "machine gun" that made a "b-r-r-r" sound when it was fired. Xavier described his "Uncle Gangsta" as a "dark complected" African American with "no hair," "a big nose[,] and gold teeth." The only description he could provide of the other assailant was that he wore a blue hat.

Mr. McMullin's cousin, Tamika McMullin, testified that she had known both defendants for approximately 15 years, that Mr. Eisom's nickname was "Gangsta," and that Mr. Moses' nickname was "Big Bo." Mr. McMullin, whose nickname was "Snap," commonly had both illegal drugs and money in his possession. Tamika and her sister drove Xavier and his mother, Shameil Johnson, home from the police station. When they arrived at Ms. Johnson's residence, "Big Bo and Robot w[ere] standing outside" next to "a maroon Impala." She said the men "approached the car and w[ere] talking to Xavier, asking him questions about what had happened that night." Tamika told the men to "leave him alone. Get away from the car."

Tamara McMullin held Xavier on her lap during the trip from the police station to Ms. Johnson's home. As they rode together, Xavier told Tamara that his "Uncle Gangster" had murdered his father.

….

When questioned initially, Mr. Eisom claimed to have been "with Dwayne Armstrong getting drunk." Later, Mr. Eisom said that he had been with his "'baby's mama' all night." Sometime in 2008, Officer Joyner received information from a confidential informant that "Paris Wilson would have information about who was involved in the homicide." Paris Wilson was "the girlfriend of Ewan Dwayne Armstrong and she was living in Rayville, Louisiana at the time." Officer Joyner interviewed Ms. Wilson on May 14, 2008, and she implicated Mr. Armstrong in the murders. Mr. Armstrong gave a "complete confession" in October 2008. Based upon Mr. Armstrong's statement, Officer Joyner went to a field in an attempt to locate "[b]urned clothing including shoes, shirts, [and] pants that were allegedly burned following the incident." They were not able to recover the items because the field "probably had been plowed and planted since the incident occurred." In his statement, Mr. Armstrong was able to reveal facts that, until that time, were "[k]nown only to law enforcement and persons who were inside the residence when the incident occurred."

Officer Joyner admitted that there was no evidence placing Mr. Eisom in the maroon Impala on the day of the offenses and that the interior of the Impala was not dusted for fingerprints. In addition, no fingerprints were recovered from any of the items found in the dumpster and the officers could not affirmatively determine who had placed the items in the dumpster.

….

3

Kelley Coles, the mother of two of Mr. McMullin's children, testified that at approximately 10:00 p.m. on the evening of August 13, 2007, she was on the telephone with Mr. McMullin when she heard him say, "Don't do this in front of my son. Just hold on, . . . I don't have a gun . . . take whatever you want." She also heard a female voice, Xavier's voice, and two male voices. She said, "After a few minutes I heard gunshots. . . . I heard two different sets of gunshots." Ms. Coles remained on the telephone for "close to an hour" before Officer Langford picked up the telephone and spoke to her. During that time, she heard other voices and noises in the house. After she talked to Officer Langford, Ms. Coles called several of Mr. McMullin's friends, including Mr. Eisom, who was "[a]t his girlfriend's with his girlfriend."

....

Nakeshia McClain, the mother of one of Mr. Eisom's children, testified that Mr. Eisom's nickname is Gangster and that Mr. Moses, who is her uncle, went by the nickname of "Bo." The maroon Impala belonged to her, and she allowed Mr. Moses to use the car "from time to time." After she lost her job and was unable to make payments on the car, Ms. McClain allowed Mr. Eisom to drive the car for a short period of time.

According to Ms. McClain, Mr. McMullin was a friend of both defendants, but Mr. McMullin and Mr. Eisom "were more like brothers." Mr. Eisom had given Mr. McMullin "a car when he . . . first got out of prison" and had helped take care of Xavier during Mr. McMullin's incarceration.

In addition to the child he fathered with Ms. McClain, who was born on December 12, 2007, Mr. Eisom and Annwan Miles had a child together on July 30, 2007. As a result, Mr. Eisom stayed overnight with Ms. Miles in the summer of 2007.

....

Ewan Dwayne Armstrong, who was incarcerated on charges of two counts of first degree murder and one count of especially aggravated robbery in connection with the victims' deaths, testified that he had not reached a plea agreement with the State but had agreed to testify against Mr. Eisom and Mr. Moses. Mr. Armstrong, who had been previously convicted of bank robbery and incarcerated in a federal penitentiary in Louisiana, testified that he was living in Evansville with his then-pregnant girlfriend, Paris Wilson, and her two-year-old son in a house provided to them by his aunt on August 13, 2007. Mr. Armstrong, who was a friend of both defendants, testified that on that day, he and Mr. Eisom were walking Mr. Eisom's pit bull dog and discussing the financial difficulties occasioned by the impending births of their children when Mr. Eisom suggested to Mr. Armstrong that they rob Mr. McMullin "to get some money together." According to Mr. Armstrong, Mr. Eisom claimed to know "[w]here he kept his money and drugs" and expressed a preference to go into Mr. McMullin's house when Mr. McMullin was home "to make sure he got everything out of the house."

....

Mr. Armstrong's former girlfriend and the mother of two of his children, Paris Wilson, testified that on August 13, 2007, Mr. Eisom, who she knew as Gangster, and another man, who she described as a large black man, came to the small one bedroom house she shared with Mr. Armstrong, and she "peeped" out of the bedroom window to see "the burgundy Impala parked like backed up in the driveway." She identified a photograph of the maroon Impala found parked outside the Brookside Apartments on August 14, 2007, as being like the car she saw, but she stated that the Impala she saw had darker tinted windows. She said that Mr. Armstrong left with the men and that when he returned sometime later, the two argued because she accused him of leaving "to be with somebody else." Mr. Armstrong at first claimed he had been "riding around . . . busting blocks." She said she did not believe him because "it don't take that long to bust blocks." Ms. Wilson said that Mr. Armstrong left their home and returned only once and that he had not come and gone several times as he testified. Eventually, Mr. Armstrong told her what had happened: "He told me that something bad had happened. I said something bad like what. And he was like I can't tell you. I was like well, you gonna tell me something. So that's when he told me. Told me that Gangster had killed somebody." She said that Mr. Armstrong did not provide any further details about the offenses.

….

Ms. Robinson's husband, Jonathan Robinson, testified that the couple had been married for five years at the time of the murders, but they had been separated for "[s]ix to eight months." Mr. Robinson admitted that he assaulted Ms. Robinson on November 19, 2005, on March 12, 2006, and again on July 31, 2007, stating, "[N]o marriage is perfect." He blamed the assaults, during which he lifted Ms. Robinson off of the ground and "slammed her," on his intoxication "with alcohol, weed and a lot of pills." He recalled being released on bail on drug charges on the afternoon of August 13, 2007, and admitted that he also attended city court on that same day because he had violated Ms. Robinson's order of protection by going to her place of employment. Mr. Robinson, who remained in the marital residence following the couple's separation, said that he did not know where Ms. Robinson was living at the time of her death and that, although he knew Mr. McMullin, he did not know where Mr. McMullin lived or that Ms. Robinson was with Mr. McMullin on August 13, 2007. Mr. Robinson admitted telephoning Ms. Robinson at 8:42 p.m., 9:07 p.m., and 9:16 p.m. on August 13, 2007, and leaving threatening messages on Ms. Robinson's cellular telephone. He explained, "I was threatening to beat her up because of what she did." Mr. Robinson denied playing any role in the murders.

Mr. Robinson testified that officers came to his residence at 3:30 a.m. on August 14, 2007, and that he thought they were there to "see if [he] had any more weed." He said that he did not believe it when officers told him that Ms. Robinson had been killed.

….

Following this proof, the State rested. Mr. Moses presented no proof. Mr. Eisom, however, presented the testimony of several witnesses.

Local bail bondsman Larry Baltimore posted a bond for Mr. Eisom on August 13, 2007, and then drove Mr. Eisom to a residence in Milltown. Mr. Baltimore described Mr. Eisom as a "fine young man," despite knowing that Mr. Eisom had been previously incarcerated for a conviction of aggravated robbery wherein he shot the victim.

Willie Moorer, who lived with Mr. Eisom's mother, Cathy Gardner, testified that on August 13, 2007, Mr. Eisom ate dinner with him and Ms. Gardner and that at approximately 8:30 or 9:00 p.m., he drove Mr. Eisom "[t]o his baby mama house." He dropped Mr. Eisom off at Ms. Miles's residence and left. Mr. Eisom and Mr. Armstrong walked Mr. Eisom's dogs before dinner on August 13, 2007.

Annwan Miles, the mother of Mr. Eisom's daughter born in July 2007, testified that although she and Mr. Eisom were not romantically involved at the time their daughter was born, they "made arrangements that [Mr. Eisom] would stay [at Ms. Miles's residence] and help" following her birth. On August 13, 2007, Ms. Miles, her three-year-old daughter, Quentera, and Laquanda Matthews' three-year-old daughter, Sereta, were at Ms. Miles's residence with Mr. Eisom and the newborn baby. Mr. Eisom arrived at her home at "[a]bout 9:00" p.m., and she "took a shower and went to bed." Ms. Miles said that her infant daughter "was real spoiled. She cried too much. So we basically had to hold her all the time." She said that Mr. Eisom came to the home on August 13, 2007, to hold the baby because she "wasn't gonna do it." When she finished her shower, Ms. Miles went to bed and left Mr. Eisom babysitting the three little girls. Sometime later, she got a call from Terry Lee Adams, who asked to speak to Mr. Eisom. Ms. Miles maintained that the baby would have cried if Mr. Eisom had put her down and that she did not hear the baby cry all night. After receiving several telephone calls, Ms. Miles asked Mr. Eisom to leave the apartment because she feared for her own safety and for the safety of the children.

Mr. Eisom's cousin, Laquanda Matthews, testified that on August 13, 2007, she took her three-year-old daughter to Ms. Miles's residence to spend time with Mr. Eisom because "she liked being around him." She let her daughter spend the night with Mr. Eisom and Ms. Miles. When she awoke the following morning and saw Mr. Eisom's photograph on the news, she called 9-1-1 and asked police not to hurt Mr. Eisom because her daughter was with him. She also saw Mr. Armstrong walking from the direction of Ms. Gardner's house at approximately 8:00 p.m. on August 13, 2007.

Ms. Gardner and Joyce McMullin, Mr. Eisom's grandmother, testified that they both telephoned Mr. Eisom at Ms. Miles's residence to tell him that Mr. McMullin had been killed. Fred P. Wells, II, testified that he had also telephoned Mr. Eisom at Ms. Miles's residence to inform him of the murders.

Qiandra Johnson, who lived near Mr. McMullin, testified that at approximately 10:00 or 10:30 p.m. on August 13, 2007, she was watching television when she saw "a fellow dressed in all black walking down the street . . . and he had like long dreads." She said

that the man "walked down the street and behind the house next door to Mr. McMullin's house and just disappeared." She knew Mr. Eisom, and the man was not Mr. Eisom.

Xavier's mother, Shameil Johnson, testified that while she was reading the paper on August 14, 2007, Xavier pointed to a photograph of Mr. Robinson and ran away. When she caught up with Xavier he said, "He was there, too" and pointed at the photograph of Mr. Robinson. Xavier said that Mr. Robinson "was the guy that killed his dad."

Ms. Johnson said that Mr. Moses was waiting at her residence when she returned from the police station with Xavier and that he asked her if "everything was all right . . . and he said if I needed anything to let him know. He was trying to be a friend." He did not attempt to talk to Xavier.

Ms. Johnson's cousin, Tiffany Fields, said that Ms. Johnson and Xavier spent the night at Ms. Fields's house after they left the police station. On the following day, Mr. Robinson's photograph appeared in the newspaper, and Xavier refused to let anyone throw the paper away. Xavier pointed to the picture and told her that he had seen Mr. Robinson before. He did not say that Mr. Robinson had killed his father.

Crystal Richards, who had dated Mr. Robinson "five or six years" before the trial and who was a friend to Mr. McMullin, testified that during their relationship, Mr. Robinson "was very abusive" and, at one point, had "[h]eld a gun to [her] head." She testified that she and Mr. Robinson got into an altercation at a club and that on the following morning, "[she] woke up and he had a 9mm to the back of [her] head and told [her] he would kill [her] if [she] ever did that again." She said that Mr. Robinson was also abusive to her children and that he had held her hostage in her own home by nailing "2x4's up over the door." She said that he tried to force her to drink gasoline when she tried to leave him.

On the basis of this proof, the jury convicted Mr. Eisom of the first degree felony murder of Mr. McMullin, the first degree felony murder of Ms. Robinson, and the especially aggravated robbery of Mr. McMullin. The jury convicted Mr. Moses of the facilitation of the first degree felony murder of Mr. McMullin, the facilitation of the first degree felony murder of Ms. Robinson, and the especially aggravated robbery of Mr. McMullin. By operation of law, *see* T.C.A. § 39–13–208(c) (2006), Mr. Eisom received life sentences for both convictions of first degree felony murder. The trial court held a sentencing hearing to determine the sentences to be imposed for Mr. Eisom's conviction of especially aggravated robbery and to determine whether the three sentences should be served consecutively or concurrently. The trial court also conducted a sentencing hearing to determine the appropriate punishment for Mr. Moses.

At the joint sentencing hearing, the State presented proof that Mr. Eisom was on bond at the time of the offenses and that Mr. Moses was serving a community corrections sentence at the time of the offenses. Mr. Moses presented no proof. Mr. Eisom presented no proof but elected to make a statement to the court. *See id.* § 40–35–210(b)(7). Mr. Eisom said,

I guess this is the time for me to show remorse or beg for mercy or leniency. I will not—as for the guilty, I'm not guilty. For me and my loved ones is a time for solidarity and reflection. At the beginning of these proceedings, I asked for my rights to be protected, but they have been trampled in order to satisfy the victims' families and the prosecution. What about my family, my kids? What about Mr. Moses' family and his kids? I guess we have to be sacrificed in order to preserve Dyersburg's justice. We will appeal and give you these sentences back, because that's what the real law says. In order to find the real law, we have to go farther than Dyersburg. God bless all families involved. Thank you.

At the conclusion of the sentencing hearing, the trial court found Mr. Eisom to be a Range II offender, *see id.* § 40–35–106, a professional criminal, *see id.* §-40-35-115(b)(1), an offender whose record of criminal activity is extensive, *see id.* § 40-35-115(b)(2), and a dangerous offender, *see id.* § 40-35-115(b)(4). Based upon these findings, the trial court imposed a sentence of 40 years for the conviction of especially aggravated robbery and ordered that all three of Mr. Eisom's sentences be served consecutively.

*Eisom*, 2010 WL 4540069, at *1-11.

## II.    LAW

Rule 56 provides in pertinent part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court is to "view facts in the record and reasonable inferences that can be drawn from those facts in the light most favorable to the nonmoving party." *JP Morgan Chase Bank, N.A. v. First Am. Title Ins. Co.*, 750 F.3d 573, 578 (6th Cir. 2014) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). It is not to "weigh evidence, assess credibility of witnesses, or determine the truth of matters in dispute." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

The moving party "has the initial burden of showing the absence of a genuine dispute as to a material fact." *Automated Solutions Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 520 (6th Cir. 2014) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the motion is properly supported, "the opposing party must go beyond the contents of its pleadings to set forth

specific facts that indicate the existence of an issue to be litigated." *Slusher v. Carson*, 540 F.3d 449, 453 (6th Cir. 2008). The nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson*, 477 U.S. at 248. The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.* A court must grant summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23.

As Petitioner filed his habeas application subsequent to the enactment of the Antiterrorism and Effective Death Penalty Act, Pub.L. 104-132, 110 Stat. 1214 ("AEDPA"), the provisions of that law govern the scope of the court's review. *See Penry v. Johnson*, 532 U.S. 782, 791 (2001); *Wilson v. Parker*, 515 F.3d 682, 691 (6th Cir. 2008); *Hester v. Ludwick*, 2010 WL 4102676, at *4-5 (W.D. Mich. Apr. 14, 2010). The AEDPA "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands that state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005); *see Wilkins v. Timmerman–Cooper*, 512 F.3d 768, 774 (6th Cir. 2008). "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006). If a state court adjudicated the claim, deferential AEDPA standards must be applied. 28 U.S.C. § 2254(d); *see Waddington v. Sarausad*, 129 S. Ct. 823 (2009).

The AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).

Section 2254(d) states that an application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was determined on the merits in state court unless the adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The section's 'contrary to' and 'unreasonable application' clauses possess independent meaning. *Bell*, 535 U.S. at 694. "A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than the [Supreme Court] on a set of materially indistinguishable facts." *Id.* A federal court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from Supreme Court decisions but unreasonably applies it to the facts of the particular case, or if the state court unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams v. Taylor*, 529 U.S. 362, 407 (2000); *see Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). Furthermore, a district court may consider only the "clearly established" holdings—not dicta—of the Supreme Court. *Williams*, 529 U.S. at 412; *Wilson*, 515 F.3d at 691; *Ross v. Petro*, 515 F.3d 653, 660 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 906 (2009). The court may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *See Williams*, 529 U.S. at 381 ("If this Court has not broken sufficient legal ground to establish

an asked-for constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar."); *see also Knowles v. Mirzayance*, 129 S. Ct. 1411, 1419 (2009); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Regardless of the subsection of 2254(d) relied on by the petitioner, AEDPA requires heightened respect for state factual findings. 28 U.S.C. § 2254(e)(1); *see Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Jaradat v. Williams*, 591 F.3d 863, 864–65 (6th Cir. 2010); *Mills v. Cason*, 572 F.3d 246, 250 (6th Cir.2009).

## III.    ANALYSIS

### (A) Sufficiency of the evidence

On direct appeal, Petitioner challenged the sufficiency of the evidence. *Eisom*, 2010 WL 4540069, at *15. The TCCA rejected this argument on the merits:

> We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654. Although a criminal offense may be established exclusively by circumstantial evidence, *Duchac v. State*, 505 S.W.2d 237 (Tenn.1973); *Winters*, 137 S.W.3d at 654, before an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." *State v. Crawford*, 225 Tenn. 478, 470 S.W.2d 610, 612 (Tenn. 1971). "In other words, '[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt.'" *State v. McAfee*, 737 S.W.2d 304, 306 (Tenn. Crim. App. 1987) (quoting *Crawford*, 470 S.W.2d at 613).
>
> When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137

S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

It is well settled "that a conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense." *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001) (citing *State v. Stout*, 33 S.W.3d 531 (Tenn. 2001); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *Monts v. State*, 214 Tenn. 171, 379 S.W.2d 34, 43 (Tenn. 1964)). By way of explanation, our supreme court has stated:

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged.

> It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bane*, 57 S.W.3d at 419 (quoting *Bigbee*, 885 S.W.2d at 803); *see also State v. Fowler*, 213 Tenn. 239, 373 S.W.2d 460, 463 (Tenn. 1963) (citations omitted).

In this case, there can be no doubt but that Mr. Armstrong was an accomplice in the especially aggravated robbery of Mr. McMullin and in the murders of Mr. McMullin and Ms. Robinson. The State concedes as much but argues that other evidence sufficiently corroborated Mr. Armstrong's recollection of the offenses. We will consider the evidence against each defendant separately.

Mr. Eisom was convicted of first degree felony murder in the deaths of Mr. McMullin and Ms. Robinson and the especially aggravated robbery of Mr. McMullin. First degree felony murder as charged in this case is the "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." *Id.* § 39-13-202(a)(2). "Especially aggravated robbery is robbery . . . (1) accomplished with a deadly weapon; and (2) where the victim suffers serious bodily injury." *Id.* § 39-13-403(a). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401.

With regard to Mr. Eisom, the proof adduced at trial, in addition to the thorough account of the crimes provided by Mr. Armstrong, established that Mr. Eisom and Mr. Armstrong walked Mr. Eisom's dogs during the evening hours of August 13, 2007. Ms.

Wilson testified that Mr. Eisom later came to the residence that she shared with Mr. Armstrong and that the two men, along with a third unidentified individual, left together in a maroon Impala. When Mr. Armstrong returned to their home later that same evening, he told Ms. Wilson that Mr. Eisom had murdered the victims. Ms. Ford, Lieutenant Williams, and Tamara McMullin each testified that Xavier said that "Gangsta" or "Uncle Gangsta" had murdered his father. Several witnesses testified that Mr. Eisom's nickname was "Gangsta" and that Xavier referred to Mr. Eisom as "Uncle Gangsta." Xavier also told Lieutenant Williams that Mr. Eisom carried "a short gun" while "the other boy" carried an "oozie," which corroborates Mr. Armstrong's testimony that Mr. Eisom armed himself with a revolver while Mr. Armstrong was armed with a 9mm carbine. Xavier's statement to Ms. Ford that the perpetrators demanded money corroborated Mr. Armstrong's testimony that the pair robbed Mr. McMullin. Although Mr. Eisom presented proof attempting to establish that he was at Ms. Miles's house caring for his infant daughter when the murders occurred, the jury, as was its prerogative, chose to reject this testimony. In our view, the evidence, when examined in the light most favorable to the State, was sufficient to support Mr. Eisom's convictions of first degree felony murder and especially aggravated robbery.

*Id.* at 15-16.

In *Jackson*, the Supreme Court held that in a challenge to a state criminal conviction brought under § 2254—if the settled procedural prerequisites for such a claim have otherwise been satisfied—the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial, no rational trier of fact could have found proof beyond a reasonable doubt. 443 U.S. at 324. This standard requires a federal district court to examine the evidence in the light most favorable to the State. *Id.* at 324, 326 ("a federal habeas corpus court faced with a record of conflicting facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution").

Petitioner alleges the decision of the TCCA was an unreasonable application of *Jackson*. Eisom first asserts that the evidence was insufficient to corroborate all of Armstrong's trial testimony, specifically that he was the one who shot Ms. Robinson. (D.E. 24 at 20.) However, as the TCCA explained, the Tennessee Supreme Court has held that the corroborative evidence

presented may be either direct or entirely circumstantial, and it does not need to be adequate, standing alone, to support a conviction; "it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence." *Bane*, 57 S.W.3d at 419. Eisom's argument that the State was required to corroborate each specific part of Armstrong's testimony is groundless.

The TCCA, in reviewing the convictions, found that when considering the evidence in light most favorable to the state, Armstrong's testimony was corroborated by Xavier Johnson's statements and identification of Eisom as "Gangsta" to "Ms. Ford, Lieutenant Williams, and Tarmara McMuliln," and by Xavier's descriptions of the type of guns he saw used in the robbery and murders. *Eisom*, 2010 WL 4540069, at *16. Although Petitioner presented proof in an attempt to establish an alibi, the jury—in its prerogative—rejected this testimony. *Id.* As established *supra*, AEDPA requires highted respect for state factual findings. 28 U.S.C. § 2254(e)(1). Once a factual determination by the state court is made, it is presumed to be correct, and Petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Jaradat*, 591 at 864-65. Although Eisom strenuously disagrees with the TCCA's opinion, he has not provided "clear and convincing evidence" that its decision was contrary to, or an unreasonable application of, the governing law.[1] Accordingly, Petitioner's motion on this ground is DENIED.

---

[1]Petitioner also argues that Xavier's testimony should have been suppressed and that his trial counsel should not have stipulated to his statements. These arguments do not concern the sufficiency of the evidence presented and will be addressed *infra*.

(B) Ineffective Assistance: Post-Conviction Appellate Counsel

Next, Petitioner contends that his post-conviction appellate counsel was ineffective for failing to raise a claim of ineffective assistance of post-conviction counsel on appeal from the denial of his post-conviction petition in violation of *Strickland v. Washington*, 466 U.S. 668 (1984), and *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). This is the first time Eisom has raised this issue. It is well-established law that a habeas petitioner must first exhaust available state remedies before requesting relief under § 2254. *E.g.*, *Granberry v. Greer*, 481 U.S. 129, 133-34 (1987); *Rose v. Lundy*, 455 U.S. 509, 519 (1982); Rule 4, Rules Governing Section 2254 Cases in the United States District Courts ("Section 2254 Rules"). To exhaust his state remedies, a petitioner must have presented the very issue on which he seeks relief from the federal courts to the courts of the state that he claims is wrongfully confining him. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971); *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). "[A] claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief." *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996). When a petitioner's claims have never been actually presented to the state courts but a state procedural rule prohibits the state court from extending further consideration to them, the claims are deemed technically exhausted and thus procedurally barred. *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991); *Teague v. Lane*, 489 U.S. 288, 297-99 (1989). A petitioner confronted with either variety of procedural default must show cause for the default and that he was prejudiced in order to obtain federal court review of his claim. *Teague*, 489 U.S. at 297-99.

In *Martinez*, the United States Supreme Court held that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural

default of a claim of ineffective assistance at trial." 132 S. Ct. at 1315. The Sixth Circuit has explained that

> to constitute cause to overcome procedural default under *Martinez,* a petitioner must show that: (1) he has a substantial claim of [ineffective assistance of counsel]; (2) counsel on initial state collateral review was nonexistent or ineffective; (3) the state collateral review proceeding was the initial review proceeding as to the [ineffective assistance of counsel]claim alleged; and (4) the state *requires* that the [ineffective assistance of counsel] claim be raised for the first time during the state collateral proceeding.

*Atkins v. Holloway*, 792 F.3d 654, 658 (6th Cir. 2015). The court noted that "ineffective assistance of post-conviction counsel can establish cause to excuse a Tennessee defendant's procedural default of a substantial claim of ineffective assistance at trial." *Id.* It clarified, however, that "the *Martinez–Trevino* exception does not extend to attorney error at post-conviction *appellate* proceedings because those proceedings are not the 'first occasion' at which an inmate could meaningfully raise an ineffective-assistance-of-trial-counsel claim." *Id.* (quoting *West v. Carpenter*, 790 F.3d 693, 698 (6th Cir. 2015)).

In the instant matter, Eisom is alleging attorney error at post-conviction appellate proceedings based on errors that originated with trial counsel. As the Sixth Circuit noted, the *Martinez* exception carved out by the Supreme Court does not extend to these types of assertions. *See id.* Accordingly, Petitioner's motion based on this claim is DENIED.

### (C) Ineffective Assistance: Post-Conviction Counsel

Finally, Petitioner insists that his post-conviction counsel rendered ineffective assistance of counsel by failing to present three claims of ineffective assistance by trial counsel during his post-conviction proceedings. Eisom submits that the following claims of ineffectiveness by trial counsel should have been presented: (1) error in stipulating to the out-of-court statements by

Xavier Johnson; (2) failure to adequately raise a third party defense; and (3) improperly advising Petitioner not to testify at trial. (D.E. 24 at 33, 40, 48.)

(i)    Stipulation of Xavier Johnson's Statements

Petitioner argues that his post-conviction attorney was ineffective for failing to bring a claim of ineffective assistance by trial counsel for stipulating to certain out of court statements made by Xavier Johnson. (D.E. 24 at 32-33.) Eisom challenged this decision during post-conviction, which the TCCA rejected:

> The Petitioner first asserts that trial counsel erred in stipulating to the out of court statements of Xavier Johnson. The State disagrees.

> Turning to the deficiency prong, the post-conviction court stated in its order denying relief, "The Court finds that the stipulation referred to in this case was a part of trial strategy that was discussed between counsel and the petitioner prior to trial so that the choices made in this case were informed choices based on adequate preparation." The court further stated, "The issue of whether or not trial counsel allowed into evidence the statement of Xavier Johnson is part of the trial strategy dealing with the defenses available to the petitioner in this case."

> The evidence does not preponderate against the post-conviction court's findings. Trial counsel testified at the post-conviction hearing that he knew Xavier had been ruled incompetent to testify at the preliminary hearing. He continued,

>> I was aware that the young boy . . . made certain statements to individuals that I didn't think I would ever be able to get in, where he named other people as the shooter or that killed his daddy. I also knew and felt after research and what I knew about the matter that the testimony of the boy would probably not be allowed, thus the stipulation with the attorney general. . . . So, I went to the attorney general's office. And I also felt like that young man's statement was an excited utterance. I think that would have been ruled without agreeing to it.

> Trial counsel also stated that he "cleared" this decision with the Petitioner.

> Thus, the proof established that trial counsel, after adequate preparation, decided to stipulate to the admissibility of Xavier's statements in exchange for the admission of other statements that were favorable to the Petitioner. These other statements, in all likelihood, would not have been admissible otherwise. Without any further showing by the Petitioner, we will give deference to trial counsel's informed decision. *See* [*Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992)]. To the extent the Petitioner contends that trial counsel should have challenged the admission of Xavier's testimony,

rather than stipulate to allow in the testimony regarding the other identifications, we "'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" [*State v. Honeycutt*, 54 S.W.3d 762, 767 (Tenn. 2001)] (quoting *Strickland*, 466 U.S. at 689). The post-conviction court implicitly accredited trial counsel's testimony over that of the Petitioner, and we will not disturb those credibility findings on appeal. *See* [*Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999)]. Therefore, the Petitioner has failed to establish deficient performance on the part of trial counsel in this regard. Thus, we do not need to address the prejudice prong. *See* [*Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996)]. Accordingly, the Petitioner is entitled to no relief on this basis.

*Eisom*, 2013 WL 5423073, at 16.

The TCCA, in reviewing Petitioner's claim, found that he failed to establish the deficient performance prong of *Strickland*. *Id.* at 16. The post-conviction court, upon hearing the evidence, chose to accept trial counsel's testimony over that of Eisom's. *Id.* Although the TCCA reviewed the claim of ineffective of counsel de novo, it had no basis to disturb the credibility findings on appeal. *Id.* at 15-16; *see Momon*, 18 S.W.3d at 156. As established *supra*, AEDPA requires heighted respect for state factual findings. 28 U.S.C. § 2254(e)(1). Once a factual determination by the state court is made, it is presumed to be correct, and Petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Jaradat*, 591 at 864-65. As Eisom has not met that burden, his motion on this ground is DENIED.

(ii)     Adequate Third Party Defense

Petitioner also avers that his post-conviction counsel was ineffective for failing to make a claim of ineffective assistance by trial counsel for not raising an adequate third party defense. Again, this is Eisom's initial attempt to present this issue. As discussed *supra*, it is well-established law that a habeas petitioner must first exhaust available state remedies before requesting relief under § 2254. *E.g.*, *Granberry*, 481 U.S. at 133-34; *Rose*, 455 U.S. at 519; Rule 4, Rules Governing Section 2254 Cases in the United States District Courts ("Section 2254

Rules"). *Martinez*, however, provides a limited avenue for review for ineffective assistance of counsel at the post-conviction level. 132 S. Ct. at 1320. "Ineffective assistance of state post-conviction counsel can establish cause to excuse a Tennessee prisoner's procedural default of a substantial federal habeas claim that his trial was constitutionally ineffective." *Thomas v. Morgan*, No. 2:04-cv-02231, 2016 WL 1030153, at *4 (W.D. Tenn. Mar. 10, 2016). The Sixth Circuit has explained in part that "to constitute cause to overcome procedural default under *Martinez*, a petitioner must show that: (1) he has a substantial claim of [ineffective assistance of counsel]; [and] (2) counsel on initial state collateral review was nonexistent or ineffective . . . ." *Atkins*, 792 F.3d at 658.

*Strickland* places the burden on Petitioner to show both that trial counsel's performance was deficient and that it prejudiced the outcome of the proceeding. 466 U.S. at 687. To establish deficiency, Petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. "A court considering a claim of ineffective assistance of counsel must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (2011). It is "[t]he challenger's burden . . . to show that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment." *Id.* "The issue is whether counsel's performance was so manifestly ineffective that defeat was snatched from the hands of probable victory." *Smith v. United States*, Nos. 1:07-cr-146-CLC-SKL-4, 1:11-cv-215-CLC-SKL, 2015 Wl 164155, at *2 (E.D. Tenn. Jan. 13, 2015). "In order to show prejudice, [the petitioner] must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A petitioner claiming ineffective assistance of counsel faces a heavy burden." *McCullough v. United States*,

No. 12-1214, 2015 WL 1651270, at *2 (W.D. Tenn. Apr. 14, 2015). "A court is not required to conduct an analysis under both prongs of the injury. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Miller v. United States*, 561 F. App'x 485, 490 (6th Cir. 2014).

Petitioner argues the following:

> In the case at bar, trial counsel failed to lay a proper foundation for a "Third Party Defense", when Mrs. Robinson was known to have told (2) bailbonds women that if her husband Jonathan Robinson got out of jail that day, he would kill her [t]hat night after Mrs. Robinson had been observed as visibly shaking at a court hearing, counsel failed to present records admissible under Tenn. R. Evid. Rule 803(19) regarding Mr. Robinson release from jail that day for domestic violence, counsel should have had the testimony of Kathy Hendren properly admitted, to expose that this case was probably an on-going domestic violence and not an incident of aggravated robbery gone bad, had counsel properly laid down the proper foundation for Kathy Hendren's testimony to be admissible as an exception to the hearsay rule based upon her belief of impending death it would have been admissible under Tenn. R. Evid. Rule 804(2). Had the jury known these facts the outcome of Mr. Eisom trial would have been different.

 (D.E. 24 at 40.) Further, Eisom contends that trial counsel should have presented "evidence in the records that Xavier Johnson had identif[ied] Jonathan Robinson['s] picture in the newspaper, as the person who killed his daddy." (*Id.*)

The record, however, does not support Petitioner's claim that trial counsel failed to present a third party defense. The TCCA summarized the numerous witnesses presented by Eisom during his defense. *Eisom*, 2010 WL 4540069, at *9-10; *see also supra* pp. 5-7. Moreover, "[d]uring the trial, Mr. Eisom presented the testimony of bail bonding agents Lillie Cooper and Kathy Hendren, both of whom stated that Ms. Robinson was present in city court on August 13, 2007, and that she appeared visibly shaken and upset." *Id.* at 12. Trial counsel attempted to "introduce through Ms. Hendren proof that Ms. Robinson told Ms. Hendren that Mr. Robinson would kill her he if he was released from jail that day," but the trial court ruled the

statement was inadmissible hearsay. *Id.* On direct appeal, the TCCA affirmed the trial court's

exclusion. *Id.* In its analysis, the TCCA explained that

> even if the statement were offered to establish Ms. Robinson's state of mind on the day of
> her murder, the statement most certainly would not have been relevant to establish Mr.
> Robinson's culpability for the murders. Moreover, the exclusion of the statement did not
> rise to the level of a constitutional deprivation because the evidence was not critical to
> Mr. Eisom's defense. Mr. Eisom presented other proof that cast suspicion on Mr.
> Robinson, including Mr. Robinson's testimony under cross-examination that he had
> thrice assaulted Ms. Robinson and had threatened her with bodily harm on the day of the
> murder. Because the evidence was inadmissible via the rules of evidence and because it
> was not critical to Mr. Eisom's defense, the trial court did not err.

*Id.* at 13.

The proof presented at trial demonstrates that trial counsel did attempt to establish a

third party defense through multiple witnesses and the cross-examination of Mr. Robinson.

*Id.* Further, Petitioner presented testimony to establish an alibi. *Eisom*, 2010 WL 4540069,

at *9-10. However, the jury chose not to accredit this testimony and demonstrated in its

guilty verdict that it found the State's evidence more reliable. *Eisom*, 2010 WL 4540069, at

*10. Eisom has presented no evidence that trial counsel's performance was outside the range

of professionally competent legal assistance. Thus, his motion based on this claim is

DENIED.

(iii)     Counsel's Advice to Petitioner Not to Testify

Petitioner last submits that post-conviction counsel was ineffective for failing to argue

that trial counsel improperly advised him not to testify at trial. Similar to his claim regarding the

third party defense, this is the first occasion Eisom raises this issue. As established *supra*, he

must prove that he has a substantial claim of ineffective assistance of counsel to excuse the

default of this issue pursuant to *Martinez*. *See Atkins*, 792 F.3d at 658. Petitioner argues "[i]n

the case at bar, trial counsel for the petitioner advised him not to testify so that the State could

not question him about his previous convictions, so that his prior record would not be before the

jury, agree with counsel, that the best way to avoid this irrelevant and prejudicial fact from entering the trial." (D.E. 24 at 48.) Eisom also states that, "[a]lthough the court question[ed] the petitioner about his decision not to testify, the Petitioner's trial strategy was devastated" because petitioner's criminal record was eventually exposed as the result of character witness testimony. (*Id.*)

Although Eisom now maintains he should have testified, he admits that he voluntarily agreed with trial counsel that he would not do so. (*Id.*) Moreover, the trial court questioned Eisom to ensure that he understood he had a right to testify and that he was voluntarily choosing to forego that right. (*Id.*) Even though the trial did not result in the way Petitioner hoped, he has provided no basis for an assertion of ineffective assistance of counsel. Accordingly, this claim is DENIED.

IV.    CONCLUSION

Based on the foregoing, Petitioner's motion for summary judgment is DENIED.


IT IS SO ORDERED this 31st day of March 2016.

s/ J. DANIEL BREEN
CHIEF UNITED STATES DISTRICT JUDGE